# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 26, 2016

## STATE OF TENNESSEE v. RANDALL KENNETH REED

### Appeal from the Criminal Court for Hamilton County
### Nos. 280904, 281407      Rebecca J. Stern, Judge

_____

### No. E2015-01638-CCA-R3-CD – Filed May 11, 2017

_____

Defendant, Randall Kenneth Reed, was convicted by a Hamilton County Jury of four counts of the fraudulent use of a debit card, first degree premeditated murder, first degree felony murder, especially aggravated robbery, and theft of property less than $500.00. The trial court merged the premeditated murder conviction with the felony murder conviction and imposed a life sentence to be served concurrently with 25 years for especially aggravated robbery and 11 months, 29 days each for theft of property less than $500 and four counts of the fraudulent use of a debit card. The trial court further ordered the sentence to be served consecutively to a probation violation in an unrelated case. On appeal, Defendant argues as follows: (1) that the trial court erred by allowing Milo Geiger to testify that he agreed to take a lie detector test and that Defendant refused to take one; (2) that the trial court improperly admitted photographs of the victim; (3) that the trial court erred in failing to instruct the jury on the lesser-included offense of voluntary manslaughter; and (4) that the evidence was insufficient to support his convictions for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. After a thorough review of the record, we reverse the judgments of the trial court and remand for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right;
### Judgments of the Criminal Court Reversed and Remanded

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROBERT H. MONTGOMERY, JR., JJ., joined.

Donna Miller, Chattanooga, Tennessee (on appeal); and Christina Mincy and Gerald Webb, Chattanooga, Tennessee (at trial) for the appellant, Randall Kenneth Reed.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Cox, District Attorney General; and M. Neal Pinkston, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.   Background

James Donald Hutcherson testified that he was employed by Henderson, Hutcherson, and McCullough, a CPA firm located in Chattanooga. The victim, Jane Stokes, was the firm's head accountant. Mr. Hutcherson testified that the victim never missed work and always arrived early. He said that she was normally the first person at the office in the morning. On June 15, 2011, the victim did not arrive at work, although her calendar indicated that she was supposed to be there that day. Mr. Hutcherson testified that he asked another employee, Chris Davis, who was one of the victim's close friends, to call the victim's next door neighbor, Cynthia Price, to check on the victim.

Mrs. Price testified that she and the victim became friends in 1995 when Mrs. Price moved next door to her. She was familiar with the victim's "morning ritual." Mrs. Price testified that she and the victim normally left for work "within minutes of each other" and "anywhere between 6:30, and quarter to 7." She normally knew if the victim was staying home for some reason because "that was an agreement between us since her husband died." Mrs. Price testified that she knew when the victim was up in the mornings because the light was normally on in her bedroom, and the shade was "mostly" down.

Mrs. Price testified that on the morning of June 15, 2011, she left for work at approximately 6:35 to 6:40 a.m. She noticed that the light was on in the victim's bedroom and in the kitchen, and the bedroom shade was down. Mrs. Price testified that she later received a phone call from someone at the CPA firm concerning the victim's whereabouts. They knew that Mrs. Price had a key to the victim's house. Mrs. Price then called her daughter, who was at home, and asked her to go next door to the house and check on the victim.

Patricia Steinway, Mrs. Price's daughter, testified that she woke up on the morning of June 15 at approximately 8:00 to 8:30 a.m. She later received a call from Mrs. Price who asked her to look out the door and see if the victim's car was still parked in the driveway. Ms. Steinway saw the victim's car. She then got the key to the victim's house and walked next door. She attempted to open the side door to the house but the screen door was locked, and the key would not open it. Ms. Steinway called out to the victim but did not get a response. She next walked to the back of the house and tried to open the doors to the utility room and the sliding glass doors that led to the dining room and kitchen, but they were also locked, and the key would not open them. At that point Mrs. Price called her, and Ms. Steinway asked her if the key would fit the front door. As Ms. Steinway attempted to use the key to open the front door, she noticed that the door

was already unlocked, which was extremely unusual. While still on the phone with Mrs. Price, Ms. Steinway walked through the house to the victim's bedroom where she saw the victim lying on the floor. She then called 911.

Officer Julius Johnson of the East Ridge Police Department testified that he was dispatched to the victim's residence located in the City of East Ridge. When he arrived, EMS personnel were already on the scene, and the victim was hooked up to an EKG monitor, but she was already deceased. Officer Johnson testified that the victim was lying on her back on the floor with her hands behind her back. Officer Johnson testified that there was plastic cellophane wrapped around the victim's head, and her hands were bound with black nylon zip ties that had been fashioned into handcuffs. These items were eventually cut from the victim's head and wrists, and Officer Johnson transported them, along with a box of cellophane wrap found in the victim's kitchen and a black nylon zip tie found on the victim's dresser, to the Tennessee Bureau of Investigation (TBI) Crime Lab.

Officer Johnson testified that the victim's purse was sitting on her bed. Her wallet was lying beside the purse, and "a couple of cards were laying beside the wallet as well." The contents of the purse were scattered on the bed. Officer Johnson noted that the television was on in the bedroom along with a lighted make-up mirror. There were also some hair rollers lying on the floor. Officer Johnson testified that the doors under the kitchen sink were open, and the pantry door was also open in the kitchen. Officer Johnson took photographs of the scene and made a sketch of the victim's bedroom.

Detective Daniel Stephenson of the East Ridge Police Department testified that he assisted Detective Gwen Cribbs in investigating the victim's murder. He arrived at the scene and walked through the residence. Detective Stephenson later went to search the residence which belonged to Defendant's mother and father. Detective Stephenson testified that the search was focused on the garage area of the home. He said that "[t]here was a hallway and then an adjoining bedroom with that hallway that connected to the garage." Detective Stephenson learned that the bedroom belonged to Defendant. There was a white bucket in the garage containing a package of zip ties. Detective Stephenson photographed and collected the zip ties, and they were sent to the TBI. Concerning items found in the garage, Detective Stephenson further testified:

> This is a frame of a bicycle that is in the garage. And the handlebar attached to the frame. And the handles. Hanging from those handles are zip ties, black zip ties, that are connected together and then they're formed into like a makeshift handcuff design. I say that because we do similar things with the SWAT team as far as if we need makeshift handcuffs that's what . . .

There was also a zip tie "in a tear-drop shape" found in a tool box, and there was a zip tie on the garage floor. There was also a bag of zip ties on top of the tool box. The bag was labeled as a twenty-count bag, and there were fourteen zip ties left in the bag. Detective Stephenson collected the zip ties from the bicycle, tool box, and floor, and they were sent to the TBI crime lab. He said that there were three different types of zip ties that were collected.

Detective Stephenson testified that he found two gloves, boots, shoes, and "a winter ski mask type toboggan" in Defendant's bedroom. There was also a plastic Walmart bag on the couch and five additional zip ties lying underneath the bag. The zip ties and gloves were collected and sent to the TBI crime lab. Detective Stephenson testified that he also found a red hat and a red bandana "in the cavity of the nightstand."

Detective Stephenson testified that he was present at the medical examiner's office during the victim's autopsy. He said that there was a zip tie on each of her wrists and "a middle connector." The zip ties were cut off the victim's wrists by the medical examiner and given to Detective Stephenson. Detective Stephenson noted that the zip ties appeared to be the same size as those found on the bicycle at the residence where Defendant lived.

Chris Moffat testified that he owned Moffat Construction Company, and he had worked on the victim's house a number of times over the years. He said, "I actually did an addition on it probably 20 years ago and then did a lot of work on it after the April tornadoes in 2011." Mr. Moffat testified that the victim worked for his wife at the accounting firm, and he knew the victim very well.

Mr. Moffat testified that Defendant began working for him in April of 2011. Defendant worked at the victim's house for five to six days helping to rebuild a fence. He also cleaned up some of her yard. Mr. Moffat testified that Defendant "left on a Wednesday and never returned to work." He wrote Defendant his last paycheck on Friday, May 27, 2011. Mr. Moffat testified that after the victim's death, he saw a photograph in the Chattanoogan, an on-line newspaper, from a bank where the victim's debit card had been used. He immediately recognized Defendant as the person in the photograph, and he called police.

Sandy Kelly is the vice president of investigations at First Bank. She testified that the victim had an account with First Bank that had been opened at the downtown Chattanooga branch. Ms. Kelly testified that on June 15, 2011, several ATM transactions were made on the victim's account beginning at approximately 6:52 a.m. Some of the transactions were successful, and some were not. The first successful ATM withdrawal was for $300 with a $3 service charge. A second withdrawal of $200 was made, and

there was a third withdrawal for $100.  There were also some unsuccessful attempts to withdraw money.  Ms. Kelly noted that the withdrawals were made at banks other than First Bank and would have required the victim's debit card and a PIN number.

Mitch Webber is the regional security manager for SunTrust Bank in Chattanooga. His primary duty is fraud investigation.  Police provided him with a date and a debit card number and asked him to search for transactions involving the card.  Mr. Webber discovered that the card had been used at two SunTrust Bank locations.  He identified four photographs of a walk-up transaction at a branch located on Brainerd Road.  The withdrawal was made at 6:51:49 a.m. on June 15, 2011, in the amount of $200.00 with a $2.95 fee.  Mr. Webber testified that an attempt at a second withdrawal was made on June 16, 2011, at the SunTrust branch located on Lee Highway.  He again identified photographs of the attempted transaction beginning at 7:14:29 a.m.

Amos Frazier is employed by Regions Bank in corporate security.  He was asked by police on June 15, 2011, to search for a debit card number that had been used at Regions Bank.  Mr. Frazier identified a series of photographs of an ATM transaction that occurred on June 15, 2011, at 2:24 p.m. at the Regions Bank branch located on Lee Highway in Chattanooga.  The first transaction was for $40 with a $3 fee, and the second transaction was for $100 with a $3 fee.  Mr. Frazier testified that an automobile was also captured in the background of the photographs.  When asked which would be correct if the $40 withdrawal contradicted the victim's bank statements, Mr. Frazier replied, "I mean, as far as our records [they] would be correct on our end.  Now, what was on the other bank, I would have no idea."

Travis Wright is employed by First Tennessee Bank in corporate security.  In June of 2011, he was asked by the East Ridge Police Department to search bank records for possible photographs and debit card transactions in the victim's name.  Mr. Wright provided police with a series of six photographs of a transaction involving the victim's debit card that took place on East 23rd Street between 7:24 a.m. and 7:26 a.m. on June 15, 2011. The photographs depicted an individual with a white shirt on and a hat, and there was a white vehicle and another white "Suburban-type" vehicle shown in the background.

Officer Josh Creel of the East Ridge Police Department testified that he assisted in the investigation of the victim's murder.  On June 16, 2011, he received information from Detective Cribbs concerning a telephone number, and Officer Creel requested "to ping that number to find out what tower it was hitting on."  He said that the number "was hitting in the area of Lee Highway and Shallowford Road."  Officer Creel also had information from Mr. Moffat and motor vehicle records concerning a white Chevrolet Cavalier registered to Defendant.  Officer Creel began searching around hotels in the area

of Lee Highway and Shallowford Road. He found Defendant's car parked at the Travel Lodge on Shallowford Road. Officer Creel went inside the hotel and checked the registry. He learned that Defendant had rented Room 212 at the Travel Lodge on June 15, 2011, and checked in at approximately 10:00 a.m. The registration records indicated that Defendant paid for the hotel room in cash. Officer Creel was aware that Defendant lived at a residence on Stump Drive in East Ridge. Officer Creel called his supervisor who instructed him to "stand by with the vehicle and keep an eye on the room to make sure no one came or left." He also looked through the windows of the vehicle.

Detective Johnson arrived on the scene approximately one and one-half hours later with a search warrant. Officer Creel and Detective Johnson searched Defendant's car and collected a set of rubber dipped gloves, two zip ties, a screw driver, and a roll of duct tape. Officer Creel and Detective Johnson also searched Room 212 of the Travel Lodge. They found a "white T-shirt with a red texture to it. It had been found in a laundry basket sitting beside the bed in room 212." The shirt appeared to be the same one worn by the suspect in the photograph of the walk-up ATM transaction on Brainerd Road. Defendant was not present when the room and car were searched because he was at the police department. Officer Creel was aware that the zip ties found in Defendant's car were the same size, type, and color as those found on the victim's wrists.

Special Agent Mark Dunlap is a forensic scientist assigned to the serology DNA unit at the TBI Crime Lab in Nashville. He tested the middle connector of the handcuffs fashioned out of zip ties that were around the victim's wrists. The testing indicated the presence of human DNA. The partial DNA profile was consistent with a mixture of genetic material from the victim and a "male minor contributor." Defendant could not be excluded as a potential contributor of the DNA. Special Agent Dunlap also tested the cellophane wrap taken from the victim's head and face. A reddish brown stain on the wrap was swabbed and contained the victim's DNA. There was also an area of the wrap that was "wadded up." Special Agent Dunlap tested the area for "touch DNA from the person who handled that in that area." The DNA in that area of the wrap was "consistent with a mixture of genetic material from the victim and a male minor contributor." Defendant could not be excluded as the minor contributor. Special Agent Dunlap also noticed some discoloration on the cellophane wrap. He said, "It was area that was sort of flesh tone color consistent with what you would expect makeup to look like."

Special Agent Dunlap examined the shirt collected from Defendant's hotel room. A discolored area on the front left sleeve of the shirt revealed the presence of a limited amount of human DNA. Special Agent Dunlap testified that the discolored area on the left sleeve of the shirt was "very similar in appearance to the discolored substance on that cellophane." He obtained a partial DNA profile which was consistent with a mixture of genetic material. The "major contributor to that DNA profile is consistent with [the

victim]." Special Agent Dunlap noted that "all of the ST markers from the male minor contributor were inconclusive due to insufficient or degraded DNA."

Agent Miranda Gaddis is a forensic scientist assigned to the "microanalysis for trace evidence unit" of the TBI. She examined all of the zip ties collected in the present case. Agent Gaddis testified that the zip ties collected from the victim's wrists, the victim's dresser, a package of zip ties from Defendant's garage, the couch in Defendant's bedroom, the bicycle, and Defendant's car were all eight-inch zip ties with "six indentions on all of the zip ties." She testified that all of the zip ties bore the same manufacturer's mark, and they all had a number followed by the letter "P." The zip ties were also the same width and color. Agent Gaddis noted that three of the zip ties had been cut shorter.

On redirect examination, Agent Gaddis testified that the package of zip ties contained 78 ties out of 100. A total of 22 zip ties were collected from the victim's wrists, the victim's dresser, Defendant's couch, the bicycle, and Defendant's car.

Dr. Frank King, Jr., Hamilton County Medical Examiner, performed an autopsy on the victim. He said that the cause of death was "suffocation due to plastic wrap around the head." The manner of death was homicide. Dr. King noted that there were abrasions and contusions on the victim's arms and that the plastic wrap was "put around the head multiple times sealing the face over tightly." Dr. King's best estimate was that the victim died between 5:00 to 7:00 a.m. on June 15, 2011. He also noted that "it could have been a couple of hours sooner than that."

Defendant testified that on June 15, 2011, at approximately 6:20 a.m., he was in a motel room at the America's Best Value Inn in East Ridge when he received a call from a friend who was also a drug dealer. He said that the friend wanted to "meet him at a bank, that he had a card, and if I got money out on it and everything that, you know, he'd give me drugs for it and stuff." Defendant testified that he met the man that he referred to as "Milo" at the bank, and Defendant was seen in pictures using the victim's debit card at the ATM. Defendant denied that he was found in possession of the card. Defendant admitted to previously working at the victim's house, but said that he never went inside.

Defendant testified that he performed construction and electrical work for a living and that he used zip ties "all the time." He said that his parents had just bought the house where he had been living with them, and they "did a lot of wiring and redoing cable wires and everything and we tied them all up and everything." Defendant estimated that 50 to 60 ties were used for the cable wires. He thought that there were 20 to 30 different types and sizes of zip ties in the basement. Defendant testified that one pair of gloves found by police in his car were used for work. He said that a second pair of gloves found in the

house had never been worn. Defendant testified that his ex-wife also stayed in the house with him sometimes. He denied killing the victim, and he said that he turned himself in to the police after seeing his picture on the news.

On cross-examination, Defendant testified that he was staying at the America's Best Value Inn with his ex-wife. He said that they moved to the Travel Lodge because the time ran out at America's Best Value Inn which did not allow pets. He said that some of the zip-ties found in his parents' house belonged to him, and some were left there by a "previous tenant." Defendant testified that the zip ties on the bicycle were not handcuffs and that they "were to suspend the bicycle in the garage[.]" Defendant admitted that he had been previously convicted of four felonies in 2001, one in 2008, and he was convicted of arson in 2010.

Defendant testified that he had "been on drugs for the previous day or so" before using the victim's debit card. He claimed that Milo, his "drug dealer," knew that he was staying at the hotel that night because Milo had been there a couple of times earlier in the day. Defendant testified that he did not know whose name was on the debit card. He said that Milo was present when Defendant used the card. Defendant thought that he used it four or five times. He testified that Milo was not in any of the photographs because he was "standing off to the side." Defendant said that Milo's truck was in one of the pictures. He testified that he used the victim's debit card at SunTrust Bank, First Tennessee Bank, Regions Bank, and Bank of America. When asked how the victim's DNA got on his shirt, Defendant testified that he and Milo bumped into each other. Defendant claimed that Milo was wearing a gray hoodie. Defendant testified that he had worked at the victim's house for two days rather than five days as stated by Mr. Moffat.

Detective Gwen Cribbs testified that she was at the scene on June 15, 2011, and spoke with potential witnesses. She was eventually given the name "Milo." After searching for Milo for a couple of months, Detective Cribbs learned that he would be in court. She spoke with Milo at the courthouse, and they set up an interview. Detective Cribbs was unable to contact Milo when it came time for the interview. She searched for Milo and finally met with him nearly two years later in March of 2013. During the interview, Milo denied any involvement in the victim's death, and he denied knowing Defendant. Detective Cribbs also testified, "When I interviewed him we talked about the case and there were things that were said that supported that he was not present." Based on her investigation, Detective Cribbs did not feel that Milo was a suspect in the victim's murder. She said that Milo admitted that he used to be a drug dealer. On cross-examination, Detective Cribbs testified that there was no physical, direct, or circumstantial evidence against Milo uncovered during her investigation.

Milo Geiger was called by the State as a rebuttal witness. He testified that he did not know Defendant or the victim. The only time he had previously seen Defendant was when a detective showed him a photograph of Defendant. Mr. Geiger learned from a detective and a friend that Defendant said he received a credit card from Mr. Geiger. Mr. Geiger did not know where the street of the victim's home was located, and he had never worked on the victim's fence. He denied bumping into Defendant on June 15, 2011. Mr. Geiger testified that he asked to take a lie detector test, and the detective said "the other guy declined. He said he didn't want to take one."

On cross-examination, Mr. Geiger denied that he offered to take the lie detector test because he had enough experience with the criminal justice system to know that they are inadmissible. He also denied that he was a drug dealer although he had been charged with "possession or something." He said that he had never been convicted of selling cocaine because the "charge always gets changed to something else."

## II.     Analysis

### A.     Reference to Defendant's Polygraph Examinations

Defendant asserts that the trial court erred by allowing Milo Geiger to testify that he agreed to take a lie detector test and that Defendant refused to take one. It is well-settled that polygraph evidence is inadmissible. In *State v. Sexton*, 368 S.W.3d 371 (Tenn. 2012), our supreme court stated,

> Simply stated, polygraph evidence is inadmissible. *State v. Damron*, 151 S.W.3d 510, 515-16 (Tenn. 2004). This Court has repeatedly held that the results of a polygraph examination are inherently unreliable. *State v. Torres*, 82 S.W.3d 236, 252 n. 20 (Tenn. 2002); *State v. Hartman*, 42 S.W.3d 44, 61-62 (Tenn. 2001). The "lack of any indicia of reliability means it is not probative." *Hartman*, 42 S.W.3d at 60. Furthermore, "testimony regarding a [d]efendant's willingness or refusal to submit to a polygraph examination is not admissible." *State v. Stephenson*, 195 S.W.3d 574, 599 (Tenn. 2006) (appendix) (quoting *State v. Pierce*, 138 S.W.3d 820, 826 (Tenn. 2004)). One rationale for excluding the evidence is that it lacks relevance. *See* Tenn. R. Evid. 402; *United States v. Scheffer*, 523 U.S. 303, 309 n. 5, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998) (holding that polygraph evidence is unreliable).

*Sexton*, 368 S.W.3d at 409.

In *Sexton*, the defendant was convicted of two counts of first degree murder following a jury trial. Evidence of the defendant's refusal to submit to a polygraph examination was admitted over the defendant's objection at the second time the matter was brought up during testimony. The opinion of the supreme court states the following:

> In our view, any reference to a possible polygraph examination or the refusal to submit to such an examination had no place in this trial. The State should not have asked the question. The defense should have lodged a more timely objection. Curative instructions should have been provided. *See Stephenson*, 195 S.W.3d at 598-99 (appendix); *State v. Atkins*, 681 S.W.2d 571, 578 (Tenn. Crim. App. 1984). Moreover, the Defendant did not "open the door." That principle applies only when the complaining party elicits "testimony he [later] assigns as error." *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004). While a litigant is not "permitted to take advantage of errors which he himself committed, or invited, or induced the trial [c]ourt to commit," *Norris v. Richards*, 193 Tenn. 450, 246 S.W.2d 81, 85 (1952) (quoting *Gentry v. Betty Lou Bakeries*, 171 Tenn. 20, 100 S.W.2d 230, 231 (1937)), that is not the case here. Allowing the references to the polygraph test was error. To its credit, the trial court acknowledged the error during the hearing on the motion for new trial, but ruled that the admission of the evidence did not affect the results of the trial.

*Id*. at 409-10.

In this case, during the direct examination of Milo Geiger, the following events took place:

[The Prosecutor]: Judge, we need to approach one moment.

THE COURT: Okay.

\* \* \*

[The Prosecutor]: Judge, we'd like to ask him if the detective asked him if he'd take a lie detector test and he said he would.

THE COURT: He said he would?

[Defense Counsel]: But what the detective says is hearsay.

- 10 -

THE COURT:      Well, it's not offered for the truth of the matter.

[The Prosecutor]:   (Inaudible).

THE COURT:      It's not offered for the truth of the matter and the results of the lie detector test are inadmissible but not for this reason.  I'll allow it.  Go ahead.

\*      \*      \*

[The Prosecutor]:  I think when the detective talked to you she asked you if you'd take a lie detector test; is that correct?

[Mr. Geiger]:      Yes, sir.

[The Prosecutor]:  What did you say?

[Mr. Geiger]:      I said that was fine.  I actually asked her.  I was like –

[The prosecutor]:  Oh, you asked her - -

[Mr. Geiger]:      Yes.

[The prosecutor]:  - - if you could take one.

[Mr. Geiger]:      Yeah, she said the other guy declined.  He said he didn't want to take one.

[The Prosecutor]:  All right.

During cross examination, defense counsel asked Mr. Geiger the following question: "Mr. Geiger, did you offer to take a lie detector test because you've had enough experience with the criminal justice system to know they're inadmissible?"  Mr. Geiger replied, "No."

Any testimony concerning the agreement by Mr. Geiger or the refusal by "the other guy," which obviously was Defendant, was not properly admitted in this case as conceded by the State in its brief.

This case was tried on April 16-17, 2013, almost a full year after our Supreme Court filed its opinion in *Sexton* explicitly stating, in no uncertain terms, that questioning

- 11 -

like what the State did in Defendant's trial is totally improper, and the evidence is inadmissible. The trial court at the instigation of the State committed blatant error by admitting the evidence. The State asserts the issue is waived because Defendant objected to the testimony solely upon the ground of the testimony's being inadmissible hearsay evidence. No objection was made on the basis of the evidence not being relevant because it pertained to polygraph testing or on the basis that any evidence of a polygraph test is inadmissible. The trial court acknowledged this, but inexplicably still allowed the testimony to be presented presumably because it was not offered for the truth of the matter asserted, and/or because hearsay was not an appropriate objection. However, it is obvious the State offered the evidence for the truth of the facts that Mr. Geiger offered to take a polygraph exam and Defendant refused to take a polygraph exam.

The State argues Defendant's issue regarding inadmissible polygraph evidence is waived because Defendant objected to the evidence solely on hearsay. The hearsay objection should have been sustained. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). As a general rule, hearsay is not admissible during a trial, unless the statement falls under one of the exceptions to the hearsay rule. Tenn. R. Evid. 802. No exception applies in this case.

However, Defendant did not raise the trial court's overruling of his hearsay objection in this appeal. Normally, that results in waiver of the issue. See Tenn. R. App. P. 36(a)("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988)(waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987).

*Assuming* waiver by Defendant of both the hearsay issue and the polygraph testimony issue, we can still address both issues and grant relief under plain error review. In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is " 'necessary to do substantial justice.' " *State v. Smith,* 24 S.W.3d 274, 282 (Tenn.2000) (quoting *State v. Adkisson,* 899 S.W.2d 626, 641–42 (Tenn.Crim.App.1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id.* at 283.

Based upon the clear language in *Sexton* we conclude that all five criteria to grant plain error review exist as to the erroneous admission of testimony concerning Mr. Geiger's agreement to take a polygraph test and the "other guy"(obviously Defendant) refusing to do so. Defendant testified that he did not murder the victim and only used the victim's debit card because Mr. Greiger supplied it to him. Mr. Geiger testified and denied Defendant's allegations. After *Sexton*, no reasonable legal argument can be made that testimony about a polygraph exam is admissible *for any purpose*. While reasonable minds could argue the admissibility of the detective's statements and Mr. Geiger's responses thereto under the *hearsay rule,* there is no such ground at the present time as to the critical part of the out-of-court statements regarding polygraph testing. It was not admissible. Further, the State submitted and argued for, and the trial court admitted, evidence that was so obviously inadmissible that it is beyond comprehension.

Defendant was entitled to have the jury determine his credibility and the credibility of the State's witnesses, and most importantly Mr. Geiger, without the jury being exposed to the polygraph testimony. Tennessee Rule of Appellate Procedure 36(b) authorizes the setting aside of judgments when error results "in prejudice to the judicial process" in addition to when a substantial right of the defendant is involved. It is hornbook law that a defendant anywhere in the United States is entitled to the due process of law under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. It is also hornbook law at the present time that "polygraph" evidence is never admissible in Tennessee. *State v. Sexton*, 368 S.W.3d 371, 409 (Tenn. 2012).

For these reasons the convictions must be reversed and remanded for a new trial.

In the event of further appellate review, we will address the issues regarding the victim's photographs and the lesser-included offense. We will also review the issue regarding sufficiency of the evidence because if a sufficiency challenge has merit, the result is reversal and dismissal of the charges, and it is not a new trial. *See* Tenn. R.App. P. 13(e); *Burks v. United States,* 437 U.S.1 (1978); *Greene v. Massey,* 437 U.S. 19 (1978); *State v. Edward Johnson*, No. W2004-02163-CCA-R3CD, 2005 WL 1651657, at *7 (Tenn. Crim. App. July 14, 2005).

### B. *Admission of Photographs of the Victim*

Defendant argues that the trial court erred by allowing the State to introduce "[h]ighly gruesome, grotesque, and inflammatory photographs of the victim with cellophane wrapped over her face[.]" He further argues that the photographs were "cumulative evidence, making their probative value minimal."

Initially, we point out that Defendant asserts in his brief that he filed a "Motion to Limit the State's Photographs to Black and White Prints." Defendant failed to give a citation to the record as to this motion. We are also unable to locate this motion in the record or transcript of any hearing on this motion. The record also reflects that Defendant failed to object at trial to the admission of the photographs of the victim. Failure to object to the admission of demonstrative evidence, such as the photographs, prior to or during the trial proceedings results in a waiver of the issue on appeal, notwithstanding that the issue was presented in the motion for new trial. See Tenn. R. App. P. 36(a)("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); *see also State v. Killebrew*, 760 S.W.2d 228, 235 (Tenn. Crim. App. 1988)(waiver applies when the defendant fails to make a contemporaneous objection); *State v. Jenkins*, 733 S.W.2d 528, 532 (Tenn. Crim. App. 1987); *State v. Rhoden*, 739 S.W.2d 6, 11-12 (Tenn. Crim. App. 1987). We decline to exercise our discretion to review this issue by plain error review. Defendant is not entitled to relief on this issue in the direct appeal of his convictions.

### C.  *Refusal to Instruct the Jury on Voluntary Manslaughter*

Next, the Defendant contends that the trial court erred in failing to instruct the jury on the lesser-included offense of voluntary manslaughter. Tenn. Code Ann. § 40-18-110(a) provides:

> When requested by a party in writing prior to the trial judge's instructions to the jury in a criminal case, the trial judge shall instruct the jury as to the law of each offense specifically identified in the request that is a lesser included offense of the offense charged in the indictment or presentment. However, the trial judge shall not instruct the jury as to any lesser included offense unless the judge determines that the record contains any evidence which reasonable minds could accept as to the lesser included offense. In making this determination, the trial judge shall view the evidence liberally in the light most favorable to the existence of the lesser included offense without making any judgment on the credibility of evidence. The trial judge shall also determine whether the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser included offense.

Absent a written request for an instruction on a lesser included offense the failure of the trial court to instruct the jury on the lesser included offense is not available as a ground for relief either in a motion for new trial or on appeal. T.C.A. § 40-18-110(c) (2012). Our supreme court has said, "[a]s a non-structural constitutional error, the omission of a lesser-included offense instruction is subject to waiver for purposes of plenary appellate

- 14 -

review when the issue is not timely raised and properly preserved." *State v. Page*, 184 S.W.3d 223, 230 (Tenn. 2006). From our review of the record in this case, Defendant failed to make a written request for a jury instruction on the lesser-included offense of voluntary manslaughter at trial. Furthermore, Defendant failed to set forth in his brief any facts whatsoever that would support a jury charge of voluntary manslaughter as a lesser included offense. Thus, the issue is also waived by Defendant's failure to cite to the record. "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); *see also* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on").

### D.    Sufficiency of the Evidence

While we have reversed the convictions and remanded for a new trial, we must still review a challenge to the sufficiency of the evidence. Furthermore, a conclusion that there was legally sufficient evidence to support a conviction(s) is not, alone, reason to avoid a reversal and remand for a new trial based upon reversible error committed by the trial court. Defendant asserts that the State did not prove beyond a reasonable doubt his identity as the person who committed the murder. Defendant argues that while there was proof that he used the victim's debit card, there was "no uncontroverted DNA or physical evidence to show that he was ever in the victim's home or had contact with her." He contends that the debit card was supplied to him by his drug dealer named "Milo." Therefore, Defendant asserts that the evidence was insufficient to support his convictions for first degree premeditated murder, first degree felony murder, and especially aggravated robbery. We find that the evidence was sufficient to support the convictions.

The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn

therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

First degree premeditated murder is "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "'Intentional' means that a person acted intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-106(a)(18). As defined in the code,

> "[P]remediation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d). Because a defendant's mental state at the time of the offense is often difficult to discern, "Tennessee courts frequently look to circumstances surrounding the killing in order to determine if the proof is sufficient to support a jury's finding of premeditation." *State v. Larkin*, 443 S.W.3d 751, 815 (Tenn. Crim. App. 2013) (citing *State v. Jackson*, 173 S.W.3d 401, 408 (Tenn. 2005); *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *State v. Vaughn*, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008)). Such circumstances include:

> the use of a deadly weapon upon an unarmed victim; lack of provocation by the victim; the accused's declarations of an intent to kill; the accused's

failure to render aid to the victim; facts indicative that the accused had a motive to kill the victim; the particular cruelty of the killing; the accused's procurement of a weapon prior to the killing; preparations to conceal the crime before the crime is committed; destruction or secretion of evidence of the killing; and the accused's calmness immediately after the killing.

*Id.* (citing *State v. Thacker*, 164 S.W.3d 208, 222 (Tenn. 2005); *State v. Bland*, 958 S.W.3d 651, 660 (Tenn. 1997); *State v. Lewis*, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000)). Additionally, when combined with other of these circumstances, proof of repeated blows to the victim is relevant to establish premeditation. *Id.*

As charged in this case, first degree felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

"Knowing" means that a person acted knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

Tenn. Code Ann. § 39-11-106(a)(20). "Intentional" is defined above.

Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is accomplished with a deadly weapon and results in the victim suffering serious bodily injury. Tenn. Code Ann. § 39-13-401(a), -403(a).

Defendant does not argue that there was insufficient proof of the statutory elements of first degree premeditated murder, first degree felony murder, and especially aggravated robbery; instead, he challenges the evidence supporting his identity as the perpetrator of these offenses.

In a light most favorable to the state, the proof shows that the victim, who lived alone, was found lying on her bedroom floor by a neighbor who was asked to check on the victim because the victim failed to show for work on the morning of June 15, 2011. The victim was found deceased with her hands bound behind her back with black nylon zip ties that had been fashioned into handcuffs, and her head was wrapped with cellophane. The victim's purse was sitting on her bed with the contents scattered about the bed. Her wallet was lying beside the purse with a couple of cards lying beside the

wallet as well. The Medical Examiner, Dr. King, determined that the victim died as a result of "suffocation due to plastic wrap around the head," and the manner of death was homicide. Dr. King testified that there were abrasions and contusions to the victim's arms, and the plastic wrap was "put around the head multiple times sealing the face over tightly." He estimated that the victim died between 5:00 to 7:00 a.m. on June 15, 2011.

Defendant, working for Chris Moffat, owner of Moffat Construction Company, had worked at the victim's house for five to six days in April or May of 2011, helping to rebuild a fence. He also cleaned up some of her yard. After the victim's murder, Mr. Moffat saw a photograph in the Chattanoogan, an online newspaper, from a bank where the victim's debit card was being used. He immediately recognized Defendant as the person in the photograph using the card, and he called police. Defendant used the victim's debit card at five different banks, and he withdrew a total of at least $600 from the victim's account.

Agent Gaddis examined all of the zip ties collected in the present case. She testified that the zip ties collected from the victim's wrists, the victim's dresser, a package of zip ties from Defendant's garage, the couch in Defendant's bedroom, a bicycle in Defendant's house, and Defendant's car were all eight-inch zip ties with "six indentions on all of the zip ties." She testified that all of the zip ties bore the same manufacturer's mark, and they all had a number followed by the letter "P." The zip ties were also the same width and color. Agent Gaddis noted that three of the zip ties had been cut shorter. The zip ties found on the bicycle were fashioned into makeshift handcuffs similar to those cut from the victim's wrists. Agent Gaddis testified that the package of zip ties contained 78 ties out of 100. A total of 22 zip ties were collected from the victim's wrists, the victim's dresser, Defendant's couch, the bicycle, and Defendant's car.

Additionally, Defendant could not be excluded as a potential minor contributor of the DNA found on middle connector of the handcuffs fashioned out of zip ties that were removed from the victim's wrists. There was an area of DNA found on the cellophane wrap taken from the victim's head. Defendant also could not be excluded as a potential "male minor contributor" of that DNA. There was some discoloration on the cellophane wrap that was consistent with makeup. Police found a "white T-shirt with a red texture to it" inside a motel room where Defendant had been staying. The shirt appeared to be the same one worn by Defendant in the photograph of one of the walk-up ATM transactions using the victim's debit card. Special Agent Dunlap testified that the discolored area on the left sleeve of the shirt was similar to the appearance of the discolored substance on the cellophane taken from the victim's head. He also obtained a DNA profile from the shirt which was consistent with a mixture of genetic material. The "major "contributor to that DNA profile was consistent with the victim.

Although Defendant testified that he had never been inside the victim's house, that he did not kill her, and that "Milo" gave him the victim's debit card, the jury was free to reject this testimony. Milo Geiger was called to testify at trial. He stated that he did not know Defendant or the victim, and he had not been to the victim's house. Detective Cribbs testified that there was no physical, direct, or circumstantial evidence against "Milo" uncovered during the investigation of the victim's death.

We conclude that the evidence is legally sufficient to establish the identity of Defendant as the perpetrator of the offenses in this case. Any conflicts in testimony, weight of the evidence, and the credibility of witnesses were determined by the jury. Unfortunately for the State, its insistence to present clearly inadmissible polygraph testimony, and the trial court's allowance of this evidence to be presented to the jury, skews the ability to give full credence to the jury's determination of the testimony of two key witnesses: Defendant and Mr. Geiger. In reviewing a challenge to the legal sufficiency of the evidence we must include *all* evidence presented, and specifically including prejudicial erroneously admitted evidence. *State v. Ward*, 138 S.W.3d 245, 280 (Tenn. Crim. App. 2003). Thus, in the light most favorable to the State, the circumstantial evidence in this case was erroneously propped up by the inference that because Defendant refused a polygraph examination, he was lying in his testimony, and because Mr. Geiger agreed to take a polygraph examination, his testimony was truthful. Under well-settled law of *Jackson v. Virginia*, we must conclude that Defendant is not entitled to relief on his challenge to the sufficiency of the evidence. Accordingly, even though he is entitled to a reversal of his convictions for the admission of evidence error, he must face a new trial and is not entitled to have the charges dismissed with prejudice.

## CONCLUSION

The convictions are reversed, and the case is remanded for a new trial on all charges.

_____
THOMAS T. WOODALL, PRESIDING JUDGE

- 19 -